**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**ROGER A. DUNN,**

    **Plaintiff,**

    **v.**             **Case No. 25-C-981**

**FRANK BISIGNANO,**
**Commissioner of Social Security,**

    **Defendant.**

---

**DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION**

---

This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Roger A. Dunn's application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff asserts that the decision of the administrative law judge (ALJ) is flawed and requires remand. For the following reasons, the decision of the Commissioner will be affirmed.

**BACKGROUND**

Dunn filed an application for a period of disability and disability insurance benefits on April 26, 2021. He asserted an inability to work due to both of his hips being scoped, part of his colon being removed from former colon cancer, three surgeries on his right shoulder, his amputated finger, and post-traumatic stress disorder (PTSD). R. 231. After his application was denied initially and on reconsideration, Dunn requested a hearing before an ALJ. ALJ Dean Syrjanen conducted a hearing on August 12, 2024. Dunn, who was represented by counsel, and a vocational expert (VE) testified. R. 40–63.

At the time of the hearing, Dunn was 55 years old and lived in a house with his wife. R. 45. He was 5'9" and weighed 210 pounds. R. 46. Dunn had a high school education. R. 45. He joined the military in 1989, and he was deployed to Iraq in 2003 and then to Kuwait in 2005. R. 1603. He was discharged in early 2007. *Id.* After his military service, Dunn worked a number of jobs through temp services. There was not a particular area of work that he performed with regularity. R. 46. Dunn worked at a paper mill for seven or eight months, and he stacked boxes on pallets. R. 48. He had to lift and carry about 25 pounds in that position. R. 49. Dunn did not have any problems completing the job or his work performance, but he left that position to care for his son. R. 48–49. The last job he held was in 2011 as a forklift operator, and he left that job because he felt the supervisor did not like him. R. 47. He worked in that position for four to five months. Dunn testified that he did not have any difficulties completing the tasks of that job. *Id.* He indicated that he looked for other work after he lost the job, but he was new to the area and did not have the "experience like Wisconsinites have." R. 48. He stated that if he was able to perform a job where he was by himself and did not have to interact with anyone, he might have been able to function. R. 53–54. At the time of the hearing, Dunn was not currently working and was determined to be 100% disabled by Veterans Affairs (VA). R. 45.

Dunn alleged that he became disabled in 2011, and he sought disability for the period of 2011 to 2015. R. 49. He testified that the biggest issue that prevented him from working was his PTSD. *Id.* Dunn explained that loud noises would make him jumpy and edgy and that people would pull pranks on him to purposefully startle him. *Id.* As for his physical conditions, Dunn testified that he had issues with his hip and shoulder. R. 50. He had both hips scoped and three surgeries on his right shoulder. *Id.* Dunn's left middle finger was amputated at the last knuckle. R. 53. Dunn attended his regular check-ups and attended mental health therapy. R. 51. He also

2

Case 1:25-cv-00981-WCG   Filed 07/20/26   Page 2 of 15   Document 27

took medications, some of which he found beneficial. Dunn reported that his biggest symptoms, despite the medication, included depression, nightmares, anxiety, and always being on alert. He stated this his triggers included crowds and individuals of a certain ethnicity with a certain dialect. *Id.* Dunn testified that his symptoms have gotten better since getting a service dog in 2018. R. 51–52.

With respect to Dunn's activities of daily living between 2011 and 2015, Dunn indicated that in summer, he would do yardwork, do housework, and run errands. R. 52. He would try to go to grocery stores in the evening when there were fewer people and complete his shopping as quickly as he could. *Id.*

In a seventeen-page decision dated August 27, 2024, the ALJ concluded Dunn was not disabled. R. 15–31. Following the Agency's sequential evaluation process, the ALJ found that Dunn did not engage in substantial gainful activity during the period from his alleged onset date of June 15, 2011, through his date last insured of June 30, 2015. R. 18. Next, the ALJ determined that Dunn had the following severe impairments: right shoulder degenerative joint disease, bilateral hip degenerative joint disease, PTSD, and depressive disorder. *Id.* The ALJ found that Dunn did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

After reviewing the record, the ALJ determined that Dunn had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b) except "he is limited to simple/routine tasks with simple instructions; he is able to maintain attention, concentration, persistence, and pace for the performance of simple/routine tasks throughout an 8-hour workday and 40-hour workweek; he is limited to jobs with a regular set of job duties and expectations without changing tasks from day to day; he is limited to jobs where tasks can be performed

independently and that do not involve tandem tasks or more than occasional interaction with supervisors, co-workers, and the public; he can frequently reach with the bilateral upper extremities; he must avoid concentrated exposure to hazards such as moving mechanical parts and unprotected heights." R. 21. The ALJ found Dunn had no past relevant work and that, considering Dunn's age, education, work experience, and RFC, there were jobs that existed in the national economy that Dunn could have performed, including merchandise marker, collator operator, and routing clerk. R. 29–30. Based on these findings, the ALJ concluded that Dunn was not under a disability at any time from June 15, 2011, the alleged onset date, through June 30, 2015, the date last insured. R. 31. The Appeals Council denied Dunn's request for review of the ALJ's decision, making that decision the final decision of the Commissioner.

### LEGAL STANDARD

The Commissioner's final decision will be upheld "if the ALJ applied the correct legal standards and supported his decision with substantial evidence." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 42 U.S.C. § 405(g); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Crowell v. Kijakazi*, 72 F.4th 810, 813 (7th Cir. 2023) (internal quotation marks and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). The ALJ "must build an accurate and logical bridge from the evidence to his conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (citation omitted); *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998)).

The ALJ is also expected to follow the Social Security Administration's (SSA) rulings and regulations. Failure to do so, unless the error is harmless, requires reversal. *See Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court "does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

### A. Subjective Symptoms

Dunn challenges the ALJ's evaluation of his subjective allegations. The social security regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms allegedly caused by his impairments. *See* 20 C.F.R. § 404.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of a claimant's symptoms and determines how they limit the claimant's "capacity for work." § 404.1529(c)(1). In doing so, the ALJ considers all the available evidence as well as the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of his pain or other symptoms; (3) the precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) other treatment; and (6) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See* § 404.1529(c)(3); *see also* SSR

5

16-3p.  "ALJ credibility determinations are given deference because ALJs are in a special position to hear, see, and assess witnesses." *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014) (citation omitted).  On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)).  The court is not to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted); *see also Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).

The ALJ found that Dunn's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that Dunn's statements concerning the intensity, persistence, and limiting effects of these symptoms were not substantially consistent with the medical evidence and other evidence in the record.  R. 23.  With respect to Dunn's mental impairments, the ALJ noted that Dunn had persistent symptoms of PTSD and depression that affect his functioning for performance of mentally-based work activities.  R. 24.  The ALJ indicated that Dunn's symptoms appear to primarily manifest as anger, irritability, and low frustration tolerance that result in difficulties in interacting with others.  As a result, the ALJ limited Dunn to jobs that do not require more than occasional interaction with supervisors, co-workers, and the public, and to jobs where tasks can be performed independently and that do not involve tandem tasks.  The ALJ explained that, in consideration of these symptoms and others, such as concentration difficulties in general associated with moderate limitations in functional areas of understanding, remembering, or applying information and in concentration, persistence, or pace, Dunn is limited

6

to performance of simple/routine tasks throughout an eight-hour workday and forty-hour workweek. In consideration of Dunn's reported difficulties in managing his stressors and symptoms, the ALJ limited Dunn to jobs within the context of unskilled work that have a regular set of job duties and expectations without changing tasks from day-to-day. *Id.*

The ALJ concluded that the complete record presented at the hearing level did not show any additional limitations. He explained that the clinical observations and examination findings of Dunn's treating providers, examining VA psychologists, and Dunn's own statements lead to the conclusion that Dunn's lack of employment is in part the result of his own lifestyle choices, rather than any disabling mental or physical impairment. The ALJ observed that Dunn admitted to VA psychologists that he "enjoyed and thrived on" chaos and did not want to change. He noted, as an example, that Dunn admitted to his counselor that he deliberately would engage in certain activities just to annoy or anger his wife. The ALJ stated that financial gain was also a factor in Dunn's willingness to change. He explained that Dunn indicated to his counselor that changing and resulting improvement would jeopardize his VA benefits. The ALJ observed that Dunn did not return to counseling for another month after the disability evaluation (that was ultimately not favorable to him) was completed, which further suggests that Dunn's participation in treatment was financially motivated to some extent. *Id.* The ALJ stated that Dunn reported withdrawing from college in 2011 because he would be unable to fulfill the math requirements due to a lack of skills, but yet he did not pursue other re-education and vocational retraining options for which he was eligible. R. 24–25. The ALJ indicated that these statements in 2015 are noted to conflict with reports to a previous VA psychological examiner that Dunn withdrew from college due to poor concentration and inability to focus. R. 25.

Dunn argues that the ALJ's evaluation of these factors was based on improper and factually incorrect conclusions. He contends that the ALJ made logical errors that undermined any accurate and logical bridge from the evidence to his conclusion. Dunn maintains that the way he treated his wife is unrelated to his reasons for unemployment, is irrelevant to the consideration of his subjective symptoms, and is an improper attack on his character. Dunn asserts that, while he did express concerns about changing and losing his VA benefits, any unwillingness to seek change was short lived because he persisted in the therapy program, with only a one-month gap in treatment, and continued treatment for several years after the comment. He asserts that the ALJ only mentioned Dunn's participation in group therapy once, even though his involvement in group therapy was extensive. As for the fact that the ALJ connected a one-month gap in counseling in February and March 2015 to the completion of the disability evaluation, Dunn maintains that he did not learn of the unfavorable disability determination until much later in 2015. Finally, Dunn argues that the inconsistencies for the reasons Dunn left college in 2011 are not mutually exclusive, are trivial, and are not grounds to discount Dunn's statements. He contends that the re-education and training for which he may have been eligible were not possible until his symptoms were better under control.

Dunn's arguments are little more than an invitation for this court to reweigh the evidence. He has not identified any error requiring remand. Even if reasonable minds could differ as to whether Dunn was disabled during the relevant time period, the ALJ's decision must be affirmed if it is supported by substantial evidence. In reviewing for substantial evidence, the court cannot substitute its judgment for that of the ALJ. *See Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The ALJ's evaluation of Dunn's statements was not erroneous, and his consideration of this evidence is not an attack on Dunn's character. Rather, these factors

8

cast doubt on Dunn's credibility regarding his statements concerning the intensity and persistence of his symptoms.  In short, the ALJ properly considered Dunn's statements and actions as one of several factors in assessing his credibility.

After noting that Dunn's lack of employment is in part the result of Dunn's own lifestyle choices, rather than any disabling mental or physical impairment, the ALJ continued, "[r]egardless, clinical findings from mental status evaluations show good functioning across the period at issue." R. 25.  The ALJ then discussed the largely unremarkable objective evidence.  *Id.*  Dunn asserts that, while the ALJ discussed his difficulties in tasks of memory and concentration, he did not discuss Dr. Kurt Weber's testing or findings or explain why Dunn's difficulties during testing were outweighed the other findings the ALJ cataloged in detail.

But the ALJ did discuss Dr. Weber's testing and conclusions.  Dr. Weber conducted a consultative examination in August 2013.  R. 295–301.  The ALJ noted that Dr. Weber opined that Dunn had moderate limitation in the ability to understand, remember, and carry out simple instructions; moderate limitations in responding to supervisors and co-workers; moderate-to-marked limitation in the ability to maintain concentration, persistence, and work pace; and moderate-to-marked limitation in withstanding routine work stresses and adapting to changes in the work setting.  R. 28.  The ALJ indicated that Dunn had difficulties performing some tasks of memory and concentration, but he did not display deficits in visuospatial and executive functioning or ability to verbally identify various images correctly.  *Id.*  The ALJ is not required to provide a "detailed analysis" of the tests Dunn was not successful performing or explain why he concluded normal objective findings outweighed abnormal ones.  *See Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that the ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability").  Implicit in the ALJ's finding that Dunn could perform light

9

work is his further finding that Dunn was not as debilitated as he claimed. The crucial question is whether the ALJ provided reasons based on the record before him to support this conclusion. In this case, the ALJ thoroughly discussed the substantial evidence that supports his decision.

The ALJ observed that, during mental status evaluations, Dunn was typically found calm and cooperative, frequently reporting that his mood was "okay" and "great" on at least one occasion, with an affect congruent to his report. He noted that Dunn presented as stable, with normal speech in terms of rate and tone, and appropriate thought content. The ALJ indicated that Dunn had a moderately anxious and depressed affect in March 2014, but he had not been taking his medication, and that Dunn's mood was nearly always judged as euthymic between 2011 and 2013. He noted that, apart from difficulties with a delayed recall task in November 2013, Dunn's memory and cognition appeared intact, and no deficits in attention or concentration were noted. The ALJ observed that Dunn's thought content was appropriate to topic, and his thought processes were linear, logical, and goal-directed. He indicated that Dunn's judgment was deemed to be good to fair and that Dunn was observed with appropriate dress, grooming, and hygiene. The ALJ explained that, corresponding with these findings, Dunn's medication regimen provided overall good control of his symptoms. R. 25.

The ALJ stated that Dunn had received treatment dating back to approximately 2007 for symptoms of PTSD and depression associated with his military service as well as childhood trauma. R. 22. In summarizing the medical evidence, the ALJ noted that the majority of Dunn's stress and symptoms through 2013 related to the behaviors of his teenage sons, over whom Dunn obtained custody in approximately 2009. R. 22–23. He observed that, in September 2012, Dunn reported some stress at home due to his mother living with them for a time and, in 2013, he was at times frustrated with his VA disability claims/appeals for benefit increases. R. 23. The ALJ

10

indicated that Dunn also complained of aspects about previous jobs that he perceived as unfair, such as having to work harder and for less money compared to permanent employees. *Id.* Dunn asserts that, to the extent the ALJ intended it, the fact that Dunn was struggling with such stressors is not a basis to discount his allegations. But there is no evidence in the ALJ's decision from which the court can conclude that the ALJ discounted Dunn's allegations based on the fact that Dunn had these stressors.

The ALJ also noted that Dunn's level of engagement in various life activities is not consistent with disabling mental limitation. He observed, for example, that Dunn reported going on vacations (some of which were out-of-state), taking fishing and hunting trips with other veterans, socializing at bars, and being a member of committees for community events. The ALJ concluded that these activities demonstrate abilities to interact with others outside of family members and with others familiar and unfamiliar to Dunn inside and outside of his community. *Id.* He stated that, taken in isolation, these activities do not equate to the ability to sustain full-time work; however, when considered with the overall record, they suggest that Dunn retains greater mental capacities than alleged. R. 25–26. The ALJ's conclusion about Dunn's statements is supported by the evidence, is not "patently wrong," and does not necessitate remand. *Elder*, 529 F.3d at 413–14.

**B. Medical Opinions**

Dunn asserts that the ALJ erred in evaluating the medical opinions of psychological consultative examiner Kurt Weber, Ph.D. Under the current regulations, an ALJ is not required to give specific evidentiary weight to any medical opinion. 20 C.F.R. § 404.1520c(a). Instead, the ALJ must focus on the persuasiveness of the medical opinion by considering supportability, consistency, the relationship with the claimant, specialization, and other factors. § 404.1520c(c).

11

The regulation explains that supportability and consistency are the "most important factors" to consider. § 404.1520c(b)(2).

On August 30, 2013, Dr. Weber conducted a consultative examination at the request of the state agency. R. 295–301. Dr. Weber opined that Dunn should experience moderate limitations in the ability to understand, remember, and carry out simple instructions; moderate limitations in his ability to respond appropriately to supervisors and co-workers; moderate-to-marked limitations in the ability to maintain concentration, attention, and work pace; moderate-to-marked limitations in the ability to withstand routine work stresses; and moderate-to-marked limitations in the ability to adapt to changes in the work environment. R. 301.

The ALJ found Dr. Weber's opinions "somewhat persuasive." R. 28. He noted that Dr. Weber is a specialist in the field of mental health and clinically evaluated Dunn, but only on one occasion. The ALJ observed that Dunn had difficulties performing some tasks of memory and concentration, but he did not display deficits in visuospatial and executive functioning or ability to verbally identify various images correctly. He noted that Dunn was able to abstract information and spell the word "world," both forwards and backwards, did not display deficits for testing with auditory attention, and did not have difficulties in tasks measuring abilities to learn and follow a pattern. The ALJ indicated that, in interacting with Dr. Weber, Dunn was cooperative, did not display irritability or belligerence, and had appropriate dress and grooming. *Id.*

The ALJ concluded that "moderate" but not "marked" limitations across the "paragraph B" functional areas are supported by Dr. Weber's clinical examination findings. *Id.* He explained that marked limitations in the areas of concentration, persistence, or pace and in adapting to workplace changes and withstanding routine work stresses are not consistent with the record as a whole. R. 29. The ALJ noted that mental status examination findings of the providers who had

12

the benefit of observation over time were absent for deficits in attention or concentration and Dunn's thought content was appropriate to topic and no psychomotor agitation or retardation was documented. He observed that, as indicated by Dunn's psychiatric providers, Dunn's mental status was stable such that he was able to work. The ALJ noted that Dunn's reasons for unemployment have in part related to his choice of lifestyle and familial factors and that Dunn acknowledged that he would have been able to work. *Id.*

Dunn asserts that the key reasons the ALJ gave to discount Dr. Weber's opinion were factually incorrect or otherwise unsupported. First, Dunn takes issue with the ALJ's statement that, "[a]s indicated by the claimant's psychiatric providers, the claimant's mental status was stable such that he was able to work." R. 29. Dunn argues that the ALJ's assessment is premised on a mischaracterization of the evidence because none of his providers weighed in on his ability to work. But that is not what the ALJ said. The ALJ himself concluded that Dunn was able to work, based on Dunn's providers finding that he was stable. The medical records the ALJ cited noted that Dunn was "stable [and] has had significant improvement in symptoms with therapy," R. 1503, that Dunn was "near most recent baseline," R. 1521, that he was "doing well for the most part," R. 1820, and that it seemed "with continued therapy, appropriate medications, and some willingness to work on attitudinal and interpersonal style changes, he could find some suitable employment." R. 1608. The ALJ did not err in relying on these medical records to find that Dr. Weber's opinion was somewhat persuasive.

Second, Dunn takes issue with the ALJ's conclusion that Dunn's "reasons for employment have in part related to his choice of lifestyle and familiar factors." R. 29. Dunn reiterates that the ALJ's reliance on these considerations is an improper judgment about Dunn's character. But as the court explained above, these factors cast doubt on Dunn's credibility regarding his statements

13

concerning the intensity and persistence of his symptoms. It was not improper for the ALJ to consider Dunn's statements and actions in assessing whether Dr. Weber's extreme limitations were consistent with the record.

Third, Dunn argues that the ALJ made the incorrect claim that Dunn stated he would be able to work. R. 29. The ALJ cites to medical records indicating that Dunn talked to a vocational rehabilitation worker who told Dunn he "didn't have anything that matched his interests," R. 1608, and the hearing testimony where Dunn testified that he might have been able to work if he was by himself. R. 53–54. It was not improper for the ALJ to rely on this evidence in concluding that Dr. Weber's opinions were "somewhat persuasive."

As for supportability, Dunn restates his argument that, even though the ALJ noted that Dunn had difficulties performing some tasks of memory and concentration, he did not detail what the abnormal memory and concentration findings were. He argues that the ALJ listed numerous findings relating to other areas of mental functioning, such as visuospatial and executive functioning, naming, abstraction, and general fund of knowledge, but the ALJ did not explain why these findings outweighed the findings relating to his attention and concentration. Dunn asserts that, when faced with conflicting objective evidence, an ALJ must explain why certain exam findings outweigh others. Again, the kind of detail Dunn seeks is neither required nor necessary for judicial review and extends the metaphor reflected in the phrase "weighing the evidence" too far. *See Scivally*, 966 F.2d at 1076 (an ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability"). There is no standard measurement for assigning weight to evidence; we speak of the weight given to certain evidence as a way of describing how convincing or persuasive it is. In this case, the ALJ provided reasons based on the record before him to support his conclusion.

14

Dunn further asserts that the ALJ failed to address the explanation Dr. Weber gave in support of his opinion.  Dr. Weber stated that Dunn's cognitive concerns were "identified through the administration of the mental status examination, including concerns related to the delayed recall of information" and that his cognitive concerns "may inhibit his ability to function independently and appropriately."  R. 299–300.  The ALJ did not need to recount Dr. Weber's assessment word for word.  It is enough that he summarized it and indicated he considered it in light of 20 C.F.R. § 404.1520c.  In sum, the ALJ did not err in evaluating the medical opinion evidence.

## CONCLUSION

For these reasons, the Commissioner's decision is **AFFIRMED**.  The Clerk is directed to enter judgment in favor of the Commissioner.

**SO ORDERED** at Green Bay, Wisconsin this 20th day of July, 2026.

William C. Griesbach
United States District Judge